Our argument for today is In Re Walmart Securities Litigation, number 24-1818, and we'll hear from counsel for the appellant. Good morning, Your Honors.  May it please the court. Sarah Fuchs for appellants. I would like to reserve three minutes, please. That'll be granted. On March 28, 2018, after 15 months of targeted investigation, the assistant U.S. attorney for the Eastern District of Texas told Walmart it would be criminally indicted for violating the Controlled Substances Act in connection with its business dispensing prescription opioids. Two days later, Walmart filed its 2017 10-K with the SEC. It represented to investors that where a liability is reasonably possible and may be material, such matters have been disclosed. Walmart did not disclose the investigations. In its opinion, the district court acknowledged plaintiffs, quote, plaintiffs have sufficiently alleged that defendants were made aware of potential material liabilities when Walmart was told of the intended indictment. But the district court. Can I ask you a question, counsel? You say Walmart was made aware. Judge Rendell, we're having a little problem hearing you. Could you just repeat that? Yes. What is there in your complaint to describe exactly what about what this indictment would contain? Is there anything specific? Was a draft indictment given to Walmart? Aware of something. I lost the last part of what you were saying, but I think I got the gist of your question. There's correspondence from Jones Day that shows that there was that that Walmart indeed learned from a USA return on March 28th of the intended indictment. And prior to this, there had been a civil investigation parallel to the criminal investigation. So your complaint, what have you pled that Walmart specifically knew about what it was being indicted for and what the charges would be and what it related to? What is there in your pleading that Walmart actually needs? We're testing the complaint, correct? Yes, Your Honor. I understand your question. So in the complaint, it alleges that Walmart was aware that it was being investigated for violating the Controlled Substances Act in connection with its dispensing practices. And by this time, the investigation had become national in scope. So it was national. Didn't it just have to do with this one doctor? Your. And that's what specifically is stated in that. Sorry. On a 524. The theory that Rattan had was that they were aiding and abetting Dr. Diamond. Is that correct? Wait, Your Honor. The investigation started with Drs. Diamond and Wade back in 2016 in December of 2016 with a criminal raid. But then it expanded far beyond Drs. Diamond and Wade. And from the point of view of Walmart's attorney, that was their legal theory. But nevertheless, it was a criminal indictment that, as the company stated in legal correspondence, threatened the company itself, threatened billions of dollars in liability. And defendants admitted that an indictment would be devastating to the company. But I think that, you know, this is a heavily regulated area. Controlled substances. And there's a lot of different inquiries going on with a lot, particularly with a company the size of a Walmart. At what point does a disclosure need to be made? And that's kind of where we're at. I think it is any time a government entity come forward. You have to report that. It seems like that that's a pretty high hill, a little bit untenable, isn't it? Judge Chigar, I understand your question, but that is certainly not our position. A government investigation on its own does not require disclosure. There has to be something more. And there's something more in this case is that we have pled from 2011 onward from the 2009 Memorandum of Understanding, which was a four year national basically non prosecution agreement that the highest levels of management were monitoring Walmart's controlled substances compliance. And they knew they were engaging in a systematic business practice of not complying with the CSA for business reasons. There's internal documentation from 2014 that states that Walmart needed to needed to create a suspicious order monitoring system to avoid D.A. enforcement in connection with its violations of the CSA. We have board materials that were produced to the in the derivative action. Our class period, though, starts in March, March 17, 2017. Right. So isn't that what we're really we should be looking at that or you're saying context matters here? Well, certainly context matters. You have an entire history. You have a decades long history. And the period of investigation under question went back to 2011. It went back all of those years. It went back to the period when Walmart knew it was violating the MOA, when Walmart knew it was violating the CSA. And you need to look at that in the context of all of defendants knowledge of all of those under underlying violations when they would say to themselves, look, we we are violating the law and we know that we are being probed here. Now, where there's smoke, there's fire. First, it starts with. See. How did the pro pro public article change to the mix of available information? If Walmart had already disclosed it and was under investigation at that point. So what our complaint alleges is that when Walmart disclosed what it contends disclosed the investigations in June of 2018, it did not specifically disclose the investigations. There was no indication that there was a criminal investigation underway. There was no indication of the 2000 that that had violated the law in connection with the 2011 MOA or that there was a 2011. So the fourth 2018 disclosure, it was insufficient, according to you. Well, what it is, it wasn't sufficient. Arguably, the case for disclosure before June 2018 is certainly strong. There's a colorable argument that the June 2018 disclosure was sufficient. We don't think that it is because the courts say that in that companies cannot give a patchwork of honesty and omission by choosing which contingencies to expose and which to conceal. And you can see the company's intent to conceal the specifics of the investigation, which were damning because when it discloses other liabilities, it states the name of the court. For example, it disclosed a grand jury subpoenas in the middle district of Pennsylvania and any company's financial statements when it is disclosing investigations, it discloses the nature of the investigations. It did not say it was Eastern District of Texas or criminal. There's a type of granularity that's required. They have to say which U.S. attorney's office is investigating. It's not necessarily where there are regulations that say that I don't want to three of SEC where there's no independent duty to disclose that but I don't want to three, you have I don't want to three as a C for 50 says you have to state the nature of the loss. Can we find that Walmart still committed a material misrepresentation even if we find your complaint doesn't plausibly allege they violated a SC for 50. Yes, Your Honor certainly our complaint in no way rests on a SC for 50, but in part it relies on that it is, it's a secondary theory and you see that in the two minority cases, where it was the same statement is issue and the first complaint alleged a freestanding misstatement, they discussed investigations, they had they therefore incurred a duty to tell the complete truth they did not tell the complete truth, and the statement was false on its own. So, we, we amended our complaint to add an ASC for 50 violation, and the court said well, no, they, you do not have cyanter and connection with that so the standards for gap and cyanter and judgment are slightly higher, but under Omnicare when you have a, a that was misleading in context, and the company decided to speak on the subject of material legal proceedings. It could have just not talked about not said we've disclosed everything. It said we have disclosed everything. We're subject to legal proceedings, to the extent that anything is reasonably possible to be material, we have disclosed it. They filed that 10k two days after they learned that they were, they faced indictment, and there's nothing in the record that shows that at the time, they did not think that that threat of indictment was credible. And in fact, and Walmart cites the declination, and you have to look at the securities laws, look at the falsity and cyanter from an ex ante perspective, they cannot go back and say well ex post, we were never indicted, so it's all good. Well, first of all, I'm sorry, I'm sorry. My judgment. You hear me. Now we can. Okay, I have a question. You say this goes back to the mo you. And the way Walmart characterized it. The indictment in its letter in August is that they, the government would proceed under a theory that the company turned a blind eye to illegitimate prescriptions written by Dr. Diamond. So I guess my question is, March 28. Did Walmart really know what it was being what it was going to be indicted for you say it goes. And it goes back to years of failed, you know compliance with the mo you. And here Walmart later says it had to do with turning a blind eye, relating to one doctor. What was the indictment going to contain what going to be in this indictment. Well, Your Honor, because this is a PSL or a case we're not permitted, of course to conduct discovery. Prior to getting through the motion to dispense, but we as to the USA, to find out from them you don't need discovery of Walmart, you need to find out what the USA was telling Walmart. Don't you. Well, we don't need to allege the specifics of exactly what was contained in the indictment it's sufficient state that a criminal indictment, which was credible. After two years of investigation was a material threat to the company. And two months later the government and Walmart met and they did give the reverse proffer and learn what they were being in going to be indicted about, but the fact that the investigation was so broad in scope, and that they knew that they had passed violations, and that there was a credible threat of indictment certainly creates a material liability, a potential material liability. Can I ask you a question, if I suppose you could segment the different disclosures but if we, if we start with June 4 2018 and go backwards to the beginning of the period. I'm interested to find out from you. I mentioned about loss causation there. Now I understand the district court didn't deal with it. But how do you. What's the causal relationship between your alleged non disclosure and any type of damage at all during that that short period. Well, the corrective disclosure, does not have to does not necessarily have to tie to Walmart's June 2018. Thank you because we are complaint alleges this was not when the corrective disclosure occurred. Now the pro public pro public article. It's years later though, when that comes out, I'm talking about this one period, June, June of 18 back to the beginning of the, of the, of the class period. Well, the court can still find, because it's the public article is a further materialization of the concealed risks, and the full risks were not disclosed with the June 2018 disclosure, what's in the complaint though about loss causation for that particular period. From the beginning of the, of the class period to June of June 18, June of 18, we, we allege that the June 18 statement was continuing to inflate the price of the stock and the June 2018 statement was false and misleading. So there is no loss causation for June 2018 we do not allege loss causation, because the stock, the stock did not drop then, because that was not a corrective disclosure. All right, I hear what you're saying doesn't do me or your claim though from the beginning of the class period to June of 18. No, because the risks were still concealed. And the ProPublica article was new material information under the case law and the DOJ complaint was new material information. Okay. All right, thank you. We'll get you on rebuttal. Thank you, Your Honor. Hold on, hold on for one second. Rick has got the. Tell me a little bit a bit, a little bit about the text of ASC 450, don't we have to give deference to Walmart's accounting judgment uses terms like reasonable possibility or probable probability that a claim will be asserted. So under ASC 450, a material loss contingency must be disclosed when it is more than remote. If there has been a manifestation of a potential claim. So by the start of the, by the start of the class period, certainly, there was a manifestation by the government of a potential claim, because it had started investigating a and because Walmart was aware of its and continuing CSA violations. So all that is necessary is for the material liability to be reasonably possible, more than remote, and what the case law says is that when you have situations like this, where the company is aware of the mixed misconduct. Plus they're aware of an investigation and that's the SAIC case. And from the Second Circuit, they have to disclose under ASC 450. When you have cases with much more technical accounting matters that go to a lesser liabilities, then yes, there is more of a question on gap but these were, these were glaring liabilities that Mr. McMillan and the company was well aware of and they certainly go beyond the threshold of being more than remote. Judge Rendell, do you have anything more? Okay, thank you. Thank you, counsel. We'll hear you on rebuttal. Apologies for the interruption. This is Greg over Zoom. We're having a mic issue with Judge Rendell's iPad, and it's when there is noise coming from the courtroom, unfortunately, she's unable to interject. So what I would recommend is that you kind of take pauses to allow Judge Rendell to interject when she needs to. That would be my only suggestion at this time. Thank you. Thank you. Mr. Martinez. Good morning, Your Honors.  May it please the Court, Roman Martinez for the defendants here. Plaintiffs are really trying to hold Walmart liable here for an accounting judgment. The accounting judgment not to disclose the DOJ investigation sooner, but that judgment was reasonable under the relevant accounting rules. The affirmative misstatement, which I'd love to talk about, really just repeats the accounting judgment, and there's no scienter here either. I'd like to start with the question, I think, Chief Judge Chigars, you raised it, and Judge Sirica, you implicated it as well, which is like the sort of overarching question. When do you have to disclose an investigation that's sort of in process where a claim hasn't been definitively asserted yet? And I think the answer to that question comes directly from the accounting rules themselves. The accounting rule that I'm talking about in particular is, and there are a lot of hyphens and numbers, so tell me if you need me to repeat it, but it's ASC 450-20-55-15. So I'll call that 55-15. And that accounting rule is an implementation guidance, which the accounting rules say is an integral part of the rules. And it says, it's talking about when you have claims that have not yet been asserted, and here's what it says, just very clear, very categorical, very unambiguous. If the assertion of a claim is not probable, no accrual or disclosure would be required. If the assertion of a claim is not probable, no accrual or disclosure would be required. So that, I think, unambiguously sets forth a probability requirement, probability of assertion. No probability of assertion, then you don't have to disclose. Probability is defined in the accounting rules to mean likely, but the industry standard, as confirmed by the FASB itself, is people understand that term. The accounting firms, everyone understands that term to mean a likelihood of assertion of 70% or higher. So it's got to be pretty likely that it's going to happen. But I suppose your friend on the other side might say, well, your internal documents say there was a severe risk of liability here. How do you square that? Well, I think a couple things. First of all, I actually don't think the other side has made an argument that they can satisfy the probability standard. They don't even try to make that argument. Instead, their response to our point about what the accounting rules require is contained on page 16 of their reply brief. And their entire response is that we are getting the accounting rule wrong. They are trying to argue that they can satisfy a lower standard, but they're not trying to satisfy the standard that we have put forward. And I want to address specifically their challenge on page 16 of their reply brief. And my friend on the other side articulated some of these points just now. So page 16 of the reply brief, it does three things. First of all, it dismisses our reliance on 55-15. And what it says is that's just contained in the rules implementation guidance section, as though the implementation guidance was not a real accounting rule. But the note that appears right under the implementation guidance header says this is an integral part of this subtopic, i.e., it's an integral part of the rules. The other thing my friend on the other side said today is look at the Second Circuit's SAIC case. The SAIC case was not interpreting the language and the ASC rule that I've been quoting from and that we're relying on. It was applying a different predecessor rule that has since been superseded, FAS-5. There's actually language in FAS-5 that also supports us. The Second Circuit didn't address it. The language that supports us is in paragraph 38. I think it's the fifth sentence of paragraph 38. And the Second Circuit didn't have any analysis and just ignored that language. But it doesn't really matter because the language that appears in ASC-450-20-55-15 is different. It's set apart and it's a categorical unambiguous rule. So the Second Circuit's decision doesn't really govern here. And then the final thing that the other side points to is a different accounting rule, ASC-450-20-56. And they say that that rule means that the probability of assertion requirement only applies when the counterparty has not manifested awareness of the claim. And they italicize the word only because that's like really the word that's doing all the work. If you look on the third line of page 16 of their reply brief. The problem is the word only is not in there. So that rule actually doesn't limit the circumstances in which the probability requirement is in effect. Instead, we think you should apply 55-15. And that's unambiguously categorical, declarative, no questions, no disputes are permissible under that unambiguous language. It requires probability of assertion. Judge Rendell. I disagree with you regarding probability standard. And we are in the reasonable possibility that it may be material standard. How do you, you know, what if we don't agree with you on probability? Do you flunk the reasonable possibility test? No, I think the way we understand the probability test is that it's an elaboration of the general reasonable possibility test that appears in the rule that ends 50-3. So 50-3 is the general rule of when you have to disclose potential losses. And then 55-15 is the implementation guidance explaining how you apply that general rule in the context of unasserted claims. Even under the general rule, though, you would need to consider not just like the underlying facts of what the claim would be and like whether you're likely to like a jury might rule against you or not. But rather, you also have to factor in the possibility or the probability or the likelihood that the claim is going to be asserted in the first place. So it's really those two things. Like you can't just jump to the fact of like, well, did you violate the law? You have to consider is someone actually going to bring a claim against you? And I think when you consider all those things together, if you look at where Walmart was on March 28th, even after hearing from the low level, lower level line prosecutor in Eastern District of Texas, there was no basis to conclude. Certainly, there was probability of assertion, but even that the reasonable possibility test was satisfied. And hold on now. Can you can you if you can. I don't want to gloss over this point, not that not that you are. But your adversary pointed out, hey, look, this the threat of or intent to indict came on the two days before a statement came out. The statement issued said nothing about it. Right. Isn't that a problem? I don't think it's a problem. If you look at the context in which that statement was made on March 28th, first of all, it was a line prosecutor. She had no ability to speak for the U.S. attorney. The Senate confirmed U.S. attorney who was in charge and certainly no ability to speak for main justice. And everyone in this context knows that when you're thinking about a corporate prosecution, you're seeing the USA has no authority to speak on behalf of the U.S. She herself realized once Wal-Mart asked her and this is in the letter from from the Jones Day lawyer, Miss Hewitt, that she realized that once Wal-Mart said, hey, wait, what we're going to you're saying we're going to be indicted. We need to have a meeting. We want to come in and talk to you so we can understand your theories. She said, OK, well, it was clear. And I think this is at page five, twenty three to five, twenty four, that the indictment wasn't going to happen until Wal-Mart was given sort of elementary process in front of Eastern District of Texas and ultimately main justice. That's in the record at five, twenty three to twenty four. Judge Rendell, I think, had some great questions earlier about, you know, what did Wal-Mart know about what the theory was of this prosecution? And the answer is Wal-Mart didn't know much of anything. Wal-Mart had gotten some subpoenas and some document requests over the preceding year, but it had never been told what the theory was. So it was it was very hard to assess the likelihood both of assertion and of like what the ultimate liability would be. And you can see that from the record, because it's not until I think early July twenty eighteen that according to the Hewitt letter, which is cross-referenced in the complaint, that everyone sits down and the Eastern District of Texas actually provides what they call a reverse proc, where the government tells Wal-Mart what it's faced with. And then Wal-Mart has the chance to go back and forth. They cite the ProPublica article. I get what you're saying, but we have to keep in mind our context, which is motion to dismiss at the pleading stage. Now we're getting to a lot of nitty gritty. We have to we have to test this. The the allegations in the complaint. I understand that Wal-Mart, you know, you've got some good lawyers, yourself included. But, you know, we've got to test what they said here, not sort of what you know, what your defense would be, whether it's meritorious or anything of that. I agree with that. But I think the most important part is why I started where it started, is that when you're testing it, you need to make sure you're testing it against the correct legal rule and the correct accounting rule. And that's why it's important to realize that the correct accounting rule and legal rule here, as the RPM court recognized in the District of D.C., is that there's a probability of assertion requirement. And there was no it was totally reasonable for Wal-Mart to think after just getting a call essentially out of the blue from Mr. Tan on the 28th that it was going to have the opportunity to come in, talk to the eastern district of Texas, try to persuade them and then get even further appellate review in main justice. And by the way, I agree with the counsel on the other side. This isn't ultimately an ex post judgment. But Wal-Mart was right. I mean, the indictment was not brought and it wasn't brought because Wal-Mart had really good arguments laid out in detail. And Miss Hewitt's submission that an indictment here was was inappropriate. And so we had good reasons that were vindicated for not disclosing in that two day window. And I think that the judge Randall, were you trying to get in? I'm sorry, Judge Randall, it's not coming through. Better. Sorry. Don't we have a problem here in that the district court was not really focused on the March 28th threat. It seemed to think that the disclosure didn't come until April. So don't aren't you asking us to rule on what the district court didn't really didn't rule on? And that is given March 28th and then the 10K March 30th. When we will be assessing that for the first time is the district court really misperceived that, didn't it? No, I don't think so, Your Honor. I think the reference in the district court opinion, the reference to April. I don't think it was referring to the statement from Rattan about the prosecution, because the district court was very clear a few pages earlier in in the opinion. I think on page nine of I think it's either the page nine of the opinion or page nine of the appendix that it was very aware that Rattan had made that threat in March, not in April. I actually think the district court might have been mistaken and confused between April and May, because it was in the first few days of May where the U.S. attorney for the Eastern District of Texas himself said that Walmart would be indicted or that he was going to recommend or bring an indictment. That was, of course, after Walmart made the disclosure in June. And so I don't think I think there may have been an imprecision, but it was an imprecision where the district court was talking about June. Now, it was talking about May when it said April. Now, the other side said that the district court had a finding that based on the Rattan statement that Walmart was made aware of the prosecution. But actually, if you look at the place in the district court opinion, it's very clear it's talking. It's not referring to Rattan at all. Can I ask you, your friend really made a point of saying context needs to be considered here, that all of the things occurring between the beginning of the class period on should be viewed as well. Considering what happened before the class period, you know, the MOU and other things. How do you respond to that? We, of course, think context is always relevant. But I think the most important thing we need to stay focused on is and I want to address the question of whether this case is all about accounting judgments. But we think that the real issue in the case is whether the accounting judgments were right. And the accounting judgments require not just a question of whether there was an alleged violation of the MOA or the Controlled Substances Act. I'm sorry, Emily, but also whether there was a probability that that claim was going to be asserted. Judge Sereca, you asked a good question about the relationship between the accounting rule issue and then what I'll call their affirmative misstatement theory. And I really want to address that because I think it's very important. So they have this other sort of theory which they say is totally independent of the accounting judgment, which is a statement in the consolidated financial statements in the securities filings. And the statement is that, quote, that Walmart made was, quote, where a liability is reasonably possible and may be material, such matters have been disclosed. I think context is really important when we look at that statement. And the context of that statement is it's made in a securities filing, which obviously reflects accounting judgments. Note number one to that securities filing says these consolidated financial statements are prepared in accordance with GAAP. And the statement that they're accusing us of making that's fraudulent uses classic accounting language to refer to the accounting rules. It says liability. It says reasonably possible. It says material. And it says disclosure. I think in context, there's no way to read that statement other than to a reference to the various accounting rules that we've been talking about. 50-3, which, of course, is interpreted and there's guidance given on how to apply it in 55-15. So that statement is not an attempt to create some sort of freestanding rule or freestanding statement apart from the accounting rules. It's akin to a statement saying we have satisfied our disclosure requirements under the accounting rules. So if they are wrong about the accounting, then the affirmative misstatement gets them nowhere. Can I just say a word about Sienter and loss causation quickly? With respect to Sienter, even if you thought there was some confusion about what the accounting rules mean here, that confusion works in our favor. Because we have at a minimum, we have the unambiguous language of 55-15. And if there's doubt about what the accounting rules mean, that just sort of negates the inference that Walmart knew that its accounting judgments were unreasonable. There's really nothing in the record. All of the facts, including in the third amended complaint that they've tried to allege, are really about our knowledge or alleged knowledge of violations of the MOA or violations of the consumer subsystems. You did knowledge work. I mean, you've got the two individuals who are named. They were on the ethics committee. They're high ups in Walmart. Is that adequate? I think it depends. They still need allegations that those individuals knew that Walmart was making an improper accounting judgment. And there's nothing in the complaint that makes allegations about their understanding of the accounting rules or of this probability requirement or ambiguity about the probability requirement. And under the Westinghouse case, it's not enough that they know that there's some problem. They have a factual problem about Walmart's legal compliance with other laws. Rather, they need to know that there's a problem with the accounting disclosures. There's also no classic indicia of Sienter, nothing like confidential witnesses, disputes with the accountants, restatement of the financials, insider stock sales. There's nothing in that. We also have other very extensive disclosures with respect to other opioid issues, which I think shows that Walmart was operating in good faith here. Finally, loss causation. I think the comments and questions about loss causation were exactly on point. I mean, their whole theory here is that the problem was that Walmart didn't disclose a criminal indictment that never happened. And what does the ProPublica tell us? It tells us about why the criminal indictment never happened, which is we went and we spoke to the leaders of the Department of Justice, the people who stand over the U.S. attorney and the line prosecutor, and we persuaded them that it didn't make sense to bring this indictment. And so that's not a corrective disclosure. That just confirms that the accounting judgment turned out, in retrospect, to be correct. So there's no loss causation problem. Could we focus for loss causation on – I asked your adversary about the period from the beginning of the class, that'd be March 17, 2017, to June 4, 2018. Is there any allegation of loss causation for that particular period? No, and my understanding is that I think their proof of loss causation really doesn't end in the middle of the class period. It's driven by the ProPublica article, and that's the problem. The ProPublica article has a lot of juicy details and kind of inside baseball at the Department of Justice, but what does it ultimately say? It ultimately confirms the accounting judgment, and it says essentially that Walmart made a strong case to the people who, under our Constitution, are in charge of the ultimate decisions to prosecute under the president but the Justice Department. We persuaded the leaders of the Justice Department not to prosecute. That just confirms what Walmart thought was the right accounting judgment. It turns out that that was the correct accounting judgment, and so I think the loss causation argument's a real problem. Stepping back from the weeds, if I could just wrap up in 30 seconds. Stepping back from all this, I think what's really going on here is that this isn't really a securities case. This is a case in which plaintiffs and their counsel have picked up on the fact that there are allegations floating around. There are other lawsuits about CSA compliance, and they're trying to take those allegations and squeeze them into a securities law box, but it just doesn't fit. The basic allegation here, remember, is that we didn't disclose an indictment that never happened and that the stock went down based on a news article that provided more information about why it didn't happen. On Center, they have nothing, as I laid out. The stock drop here was minimal. The price bounced back within days. At most, they've alleged potential CSA violations. Walmart vigorously disputes that it violated the CSA, but even if it had, that wouldn't be a securities law problem. There's no securities fraud here, and we ask you to affirm. Judge Rendell, do you have anything more? I wanted to understand your position a little better. Even though the March 3010 case said all liabilities that are reasonably possible and may be material have been disclosed, what is the authority for making that read instead all liabilities that are probable? If they say reasonably possible, isn't that the standard we have to go by? That's a great question, and let me just walk you through it. It might take a couple steps, but I think it's very clear once we look at it. So I think the language is where liability is reasonably possible, such matters have been disclosed. I think the best way, really the only way, to interpret that statement is that it's a reference to the accounting rule that appears at ASC 450-2053, which also uses the reasonably possible language. So an investor who's reading this, the 10-K, has to look up to figure out whether reasonably possible really means reasonably possible. I think I got the gist of the question. And so what I would say is that the investor reading this is going to know from the note one, it's going to know that the things that are being reported here are being reported in accordance with the accounting rules. So it's going to be on notice that the accounting rules are being applied. Then it's going to see this accounting language, reasonably possible, and it's going to realize, or it's going to look up if it doesn't realize immediately, it's going to look to the accounting rules to figure out what reasonably possible means. The reasonably possible standard is the general standard in 50-3. It's still a little confusing about what that means, but if you read in the accounting rules, it's very helpful. It provides an implementation guidance that explains how you apply that disclosure requirement in 50-3 in the circumstances that we have here, which is where you have an unasserted claim. And that's where you get to 55-15, which says that no disclosure is required if it's not probable. And, yeah, there are a couple steps that have to be done there, but I think this is an accounting statement, and it appears in a document, a formal document that is obviously prepared in compliance. We're supposed to be prepared in compliance with the accounting rules, and that's the context in which it's going to be received. Omnicare says that when you're looking at disclosures, you need to look at context, and sometimes when things appear in formal documents like this, it's not going to be like sort of ordinary plain meaning, like what would a guy on the street think that this means. Rather, in this kind of context, you need to appreciate that these are accounting words that are being used in an accounting circumstance, and they're referring to the accounting rules. So you're not arguing for some sort of a bright-line rule about there need to be formal charges actually filed for it to end up in a disclosure? No, we're not arguing for that. What we're arguing, though, is for an application of the plain, categorical, unambiguous text of 55-15, which says if it's not probable, you don't need to disclose. Judge Sirica, do you have anything more? Okay. Thank you, counsel. Thank you, Your Honor. And we'll hear rebuttal. Thank you.  So this is a securities fraud case that my friend on the other side is trying to shoehorn into an accounting case. We could have brought this case without referencing ASC 450. It would not be reasonable for the defense to be, well, ASC 450 says we don't have to disclose it. We don't have to disclose the liability. Because Walmart made an affirmative statement, and investors are not required to parse through GAAP and other language outside of the financial statements to discern what that statement actually means. And I just want to say a word about the risk statements, which we allege are affirmatively misleading. And our friends on the other side, they ignore that. So the complaint alleges that Walmart stated any failure to comply with applicable regulatory requirements in the countries in which we operate could result in significant legal and financial exposure. And the operative word here is legal exposure. At the time Walmart made this statement, it was legally exposed. And that is an affirmatively false statement. They're talking about a risk as hypothetical. They're talking about the risk of exposure as being hypothetical when they are actually exposed. And the district court stated, well, this you're alleging an item 105 violation. That's not an independent cause of action. That was incorrect. Our complaint explicitly states this is an affirmative misstatement. And the district court simply did not address that at all. Another thing I want to point out is that at the pleading stage, you draw all factual inferences in plaintiff's favor. And my friends point out that, well, this was a line prosecutor. But when you and that the prosecutor had no power to actually indict the company. And so this was really no big deal to Walmart at the time. But when you look at the allegations in the complaint and you look at what actually happened, it was surprising and extraordinary that main justice vetoed the indictment. And we know that because the DOJ, the AUSA, the civil AUSA, he filed a whistleblower complaint to the inspector general to the DOJ inspector general. And he resigned in protest. And you have a senator who's writing a letter saying we want to understand why main justice vetoed this decision when the DEA, the head of the DEA, had signed off on the indictment. So I just want to point out that we have to look at all of these inferences, which the district court did not do, did not look at the facts in plaintiff's favor. It gave defendants the it looked at the facts solely in defendant's favor. Judge Randall, do you have anything? Judge Seneca. OK, thank you. Thank you. We thank counsel for their excellent arguments and briefing in this case. We'll take the case under advisement.